54 CCPA

**Application of Edwin H. LAND and Howard G. Rogers.**
**Patent Appeal No. 7488.**

United States Court of Customs and Patent Appeals.
Nov. 23, 1966.

Worley, Chief Judge, dissented in part.

Donald L. Brown, Cambridge, Mass. (Stanley H. Mervis, Cambridge, Mass., of counsel), for appellants.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals affirming the examiner's rejection of thirty claims of application serial No. 565,135, filed February 13, 1956, entitled "Photographic Color Processes." The claims on appeal define both processes and products and are numbered 52–55, 58–61, 63, 64, 66–71, 73–76, 78–86, and 90. The product claims are 69–71 and 82–86. The others are process claims.

### The Proceedings Below

The proceedings in the Patent Office were unusual. Appeal was taken to the board from the final rejection and the examiner filed his answer. After the hearing, the board remanded the case to the examiner "for clarification of his position." The board said, "We do not have the benefit of the Examiner's views as to the application of the references to each claim, noting that process and product claims of varying scope and different species are presented." A second Examiner's Answer was filed, going into much greater detail as to the grounds of rejection. Appellants then filed two amendments and had an interview. The examiner entered the amendments "since they materially reduce the issues on appeal" and filed a third Answer in which it was noted that several claims had been cancelled since the original appeal and that other claims had been amended so as to obviate any question of the claims

on appeal reading directly on certain references so as to be anticipated, i. e., fully met.

The references relied on throughout all three Answers and by the Patent Office Solicitor here are:

| White | 2,350,380 | | June 6, 1944 |
|---|---|---|---|
| Yutzy | 2,756,142 | | July 24, 1956 |
| | | (Filed Jan. 22, 1953) | |
| Rogers | 2,774,668 | | Dec. 18, 1956 |
| | | (Filed May 28, 1953) | |
| Land (sole) | 2,968,554 | | Jan. 17, 1961 |
| | | (Filed Aug. 9, 1954) | |
| Rogers (sole) | 2,983,606 | | May 9, 1961 |
| | | (Filed July 14, 1958) | |

(Parent applications filed Mar. 9, 1954 and June 29, 1955, now both abandoned)

––––––◆––––––

The patentees Land and Rogers are the appellants. Since two Rogers patents are cited, we will distinguish them as '668 and '606.

In the third and last Answer, the examiner summarized the situation thus:

The sole issue which appears to remain is whether the appealed claims recite obvious subject matter over Land ('554) or the claims or disclosure of Rogers ('606) in view of White, Rogers ('668) or Yutzy.

As a matter of interest, Land and Rogers, individually and jointly, are assignors to Polaroid Corporation, White to E. I. duPont de Nemours & Company, and Yutzy to Eastman Kodak Company, and are all leading inventors in the field of photography to which the present invention relates.

Following the filing of the third Answer, the board rendered its decision. In the last quotation above it will be seen that the issue of obviousness, as the examiner concisely stated it in the alternative, was a two-pronged issue: (1) It was a 35 U.S.C. § 103 issue; (2) as to Rogers '606 plus the other references, it was *also* a "double patenting" issue of the type predicated on the *claims* of a patent to a common assignee (here Polaroid, assignee of the application at bar) considered with additional prior art alleged to render obvious the subject matter of the appealed claims in view of the claims of Rogers '606. In re Simmons, 312 F.2d 821, 50 CCPA 990, decided by us in 1963, is a typical "double patenting" case of that type.

■ We here make the observation that "double patenting" is normally applied as a ground of rejection when the patent used to support the double patenting rejection is *not available* as a reference to show "prior art" under 35 U.S.C. §§ 102 or 103. However, Rogers '606 was used in this case as a prior art reference, as of the filing dates to which it was entitled, the statute presumably relied on but not stated being 35 U.S.C. § 102(e). In *Simmons*, the applicant's own prior patent could not be used as prior art *under the statute* and the rejection was therefore predicated on the theory of "double patenting." Here the applicants are Land and Rogers (jointly), and a principal reference is Rogers '606 (sole) plus other references. The existence of these different "legal entities," as the Patent Office calls them (Land and Rogers being one entity and Rogers '606 being another), is a factual distinction from *Simmons* bearing on the availability of Rogers '606, as well as Land, as prior art references against the joint Land and Rogers application, a disputed point

considered later. For the moment we merely wish to point out that the examiner used Rogers '606 in a dual capacity as a primary reference to support *both* a rejection for obviousness over the *prior art* and a rejection for "double patenting" of the type involving an obviousness issue based on Rogers' claims. We point this out because it bears on the next question we wish to consider and dispose of before getting to the merits of the appealed claims.

### The Questioned Allowance of Claim 56

Claim 56 is not on appeal. The reason it is not on appeal is that appellants thought it was allowed by the board. The reason they thought so is that the board said, "The decision of the Examiner * * * is reversed as to claim 56." The docket branch of the Patent Office, in making up the record for this court, listed claim 56 as an "allowed claim." Appellants' brief so treats it. It states on page 1:

> Claim 56 was allowed by the Board of Appeals and is printed in the Record on page 203.

According to the usual procedure, the Patent Office brief was prepared after the filing of appellants' brief and it takes issue with that statement. That is why we have before us the question, raised by the Patent Office Solicitor, whether the decision of the board did or did not allow claim 56. After devoting an inordinate amount of time at oral argument to this question, the solicitor suggests that on either of two theories claim 56 "is not before the court." The first theory was that if all rejections of claim 56 were in fact reversed, the claim is not before us. The second is that no appeal was taken on this claim, wherefore, it is not before us. Clearly, in the absence of an appeal on claim 56, the question of its patentability is not before us *on the merits*. We do consider, however, that since the Patent Office brief so insistently questions appellants' statement that the claim was allowed, we will consider whether or not it was allowed on the basis of what we find in the record.

This brings us to the fact that claim 56, like all other appealed claims, was rejected both as unpatentable over the prior art under section 103 and for "double patenting." Though not there so termed, the latter rejection originated in the final rejection where the wording of the rejection was, "unpatentable over either the disclosure of [or] the claims of one of the newly cited patents to Land and Rogers ['606] * * *." This was reiterated in the first Answer, commented on in the second Answer, with citation of authority, and dealt with at length in the third Answer, where the discussion begins and ends with these sentences (our emphasis):

> The instant claims are not seen to recite a patentably distinct invention over the claims of Rogers ('6$6) in view of Yutzy. * * *
>
> * * * * * *
>
> * * * For this reason, the present claims are not seen to be patentably distinct from Rogers ('606) in view of Yutzy. See In re Simmons, 136 USPQ 450 [312 F.2d 821, 50 CCPA 990] and In re Zickendraht, 138 USPQ 22 [50 CCPA 1529, 319 F.2d 225].

*Zickendraht* is another of our recent "double patenting" decisions, but is a quite different type of case from *Simmons*.

The solictor's argument about claim 56 is based on his view that all the board did was reverse the section 103 rejection and, since it allegedly failed to pass on "double patenting," that rejection still stands as to claim 56. We do not so read the record.

We first consider what the board itself said. Its opinion opens with the statement "No claim has been allowed." It affirmed the rejection of the examiner on prior art as to a long list of claims from which it omitted claim 56. It then took up that claim separately, discussed how it distinguished from the art and said:

> In our view the art of record *as applied by the Examiner* does not suggest the process of this claim. Accordingly,

*the rejection* of claim 56 will not be sustained. [Emphasis ours.]

We note it made no distinction as to the legal theory on which the "art of record," which includes Rogers '606, failed to suggest the claim 56 process. We note that "the rejection" was not sustained. At the end of its opinion the board said:

We do not find it necessary to rule on the rejection of the claims on the ground of double patenting with respect to Rogers, '606 since the disclosure relied upon, in the absence of a Rule 131 affidavit, is available as prior art.

It then summarized its *decision* as to all claims on appeal, ending with the statement, quoted above at the beginning of this discussion, that the *decision* of the examiner "is reversed as to claim 56." This seems to us a clear, specific statement. But this is not the end.

Appellants filed a request for reconsideration asking a specific ruling on the double patenting issue, saying that it "should be expressly thrown out since it only confuses the issues" which they intended to bring to this court. They pointed out that the examiner did not contend that appellants and Rogers '606 claimed the *same* invention, adding:

The question, then, is whether the differences between the claims on appeal and the claims of Rogers ('606) are directed to unobvious variations or improvements. This question is actually the same question presented in the art rejection under 35 U.S.C. 103.[1]

Appellants there pointed out to the board that it had in fact reversed the rejection of claim 56 and added:

Since the Board of Appeals *has allowed claim 56* to applicants, it can only be assumed that the rejection on double patenting *was considered and reversed*, at least with respect to claim 56. This

implicit holding should be made explicit. [Emphasis ours.]

Thereby the board was advised of appellants' understanding of the board's action on claim 56. In ruling on the petition, which was denied, the board said "we * * * reversed the decision [sic] of claim 56," by which it could only have meant that it had reversed the decision *of the examiner* on claim 56. Generally, they added:

In rendering our decision we relied only on the disclosure of Rogers which was available as a reference prior to the filing date of the present application. * * *

Since we sustained the rejection on the broader basis of the available disclosure we did not then, nor do we now, feel compelled to render a decision based upon the narrower aspect [basis?] of double patenting.

As we view it, the board deemed Rogers '606, insofar as it had value as a reference, to be *available* as prior art and therefore saw no reason to utilize that patent under a "double patenting" theory, which *is* "narrower" in the sense that one *cannot thus reject on the disclosure,* as the board preferred to do, but must reject on the *claims,* or what has already been patented, plus other art if desired. Thus viewed, it is reasonable to assume that the board's view was that on any theory, including "double patenting," claim 56 distinguished from the references, including the *claimed* subject matter in Rogers '606, by defining an *unobvious* process. It should be remembered that Rogers '606 was used to support an *obviousness* type of "double patenting" rejection.

The solicitor's theories concerning what the board did appear to us to be groundless. When the board was told that it *had allowed* claim 56, not only did

---

1. From the standpoint of analyzing the *obviousness* of the inventions of the appealed claims this is a correct statement. But we issue a word of warning that the obviousness question in this "double patenting" rejection, based on patent claims

plus other art, as here, is *not* an issue *under* section 103; it is not a statutory issue, as pointed out in the concurring opinion in *Zickendraht,* supra. Section 103, as such, is not involved in the "double patenting" rejection.

it not demur, it repeated that it had reversed the decision rejecting it.

This issue is discussed in the solicitor's brief at the beginning, in the middle, and at the end. It is not a mere incidental observation. After noting the statement in appellants' Notice of Appeal that the board decision appealed from had *not* refused a patent on the "subject matter defined by claim 56," it would seem to have been appropriate for the solicitor to have inquired of the board what its intended action had been, in case he had doubts about it. Furthermore, we deem it inappropriate for him to have raised the issue before us and then to have argued that we cannot deal with it because no reason of appeal brought it before us. This question was first raised in the Patent Office brief, filed long after the notice wherein the reasons of appeal are stated. 35 U.S.C. § 142. We deem claim 56 to stand allowed.

## The Invention

The invention relates to "picture-in-a-minute" photography as popularized by Polaroid Corporation, more particularly color photography. Before undertaking to describe it, we have considered whether to describe what is claimed, on the theory that the claims define what the invention is, or to describe what appears to be the invention from consideration of the oral argument and a reading of the specification and appellants' brief, on the theory the appellants can tell us through counsel what they have invented. In doing this, it appears impossible to arrive at a single concept of the invention, for different approaches lead to different results.[2] However, by setting aside the claims and the arguments specific thereto, a central theme emerges, stated at oral argument to be the gist of the invention, which seems to permeate the whole specification and to be generally agreed on by appellants and the Patent Office as the essence of the invention *sought* to be patented. One term for it is "deferred diffusion." We merely name it here and will describe it later. It is first necessary to understand the general nature of the photographic process and products in which it occurs.

The photographic color process here involved is known as diffusion transfer and we describe it in connection with a three-color process. (Two-color processes may be used.) There is a multilayer "negative" element, sometimes called a "monopack," consisting of a film base on which there are three photosensitive layers or silver halide emulsions, sensitized to different portions of the visible light spectrum. Associated with each is a color-providing substance which may be either a colored material itself, such as a dye, or a material which will react chemically to produce a dye. Associated with the monopack negative, usually *after* it has been exposed to the subject photographed, is an image-receiving layer to which some of the three colors from the negative may be transferred, "imagewise," after development of the negative, by a sort of blotting-paper action known as imbibition, it being understood that at the time of development and transfer the negative and image-receiving layer are in close face-to-face relation.

The monopack negative, broadly old, is constructed generally as follows. On the

---

2. The final rejection and first Examiner's Answer contained a rejection under 35 U.S.C. § 112 on the ground certain claims, some of which are on appeal, failed to particularly point out and define the invention, and under the same section also contained an undue multiplicity rejection. This was repeated in detail in the second Answer. After an interview and two amendments, the nature of which the record does not disclose, which followed the second Answer, this rejection was abandoned in the third Answer. We nevertheless observe a considerable gap between the invention as described and the subject matter of the broader claims. What seems to have survived is a rejection on the ground such claims, apparently because of their breadth, *define only subject matter which would be obvious* from the prior art rather than the invention as described, the board having found claim 56, which *does* define the invention described, to be directed to *unobvious* subject matter.

film support or base there is, first, a layer of red-sensitive silver halide emulsion associated with a cyan image dye. Next, there is a green-sensitive emulsion associated with a magenta image dye. On top of these layers is a blue-sensitive emulsion associated with a yellow image dye. Separate dye layers may underlie the photosensitive layers or the dye may be placed therein. The three photosensitive layers are exposed simultaneously through the camera lens and, upon development, negative images are produced, these images recording, respectively and separately, the blue, green, and red portions of light emanating from or reflected by the scene photographed.

The characteristic of this type of process is that where the silver halide has been exposed to light to which it is sensitive it can develop to produce the negative image. In doing so it acts chemically to immobilize the dye or color-former associated with it to the extent that it has been exposed. Conversely, where it has not been exposed to light it leaves the color-providing substance mobile and *free to diffuse* to the image-receiving layer to which it *transfers*, hence the name "diffusion transfer." The three colors are thus imbibed by said layer in different amounts or "image-wise" and, being superposed, produce a positive color photograph by making three color-separation printings in registration on the same sheet. This is, of course, a crude description intended only to give a general idea of what happens and the monopack is actually more complex. It may contain other layers such as barrier layers, light filtering layers, etc.

The process employed is a "subtractive" color process, the blue-sensitive layer producing the yellow (minus blue) dye, the green-sensitive layer producing magenta (minus green), and the red-sensitive layer producing cyan (minus red) which, when combined, form the positive image. Thus it is that the negative produces a positive, substantially simultaneously with its development.

Development of the negative and transfer of the image forming color-forming materials are produced, as in the previously known Land-Polaroid monochrome technique, by a single liquid processing composition which is contained in a pod associated with each picture unit of the film and adapted to be ruptured, the liquid being spread across the opposed faces of the negative and image-receiving layers when they are squeezed between rollers usually forming part of the camera. After allowing the proper time for processing, the image-receiving layer is stripped from the negative. The processing liquid is adapted to activate the rather complex chemicals which may be carried in a dry state in the monopack, and possibly also in the image-receiving layer, which commence to function as they go into solution in said liquid.

A preferred color-providing material is known as a dye-developer which is both a dye, supplying the desired color for the positive image, and a developer for the silver halide light-sensitive element with which it is associated. The use of dye-developers appears to be the invention of Rogers and is described and claimed in his '606 patent which is a reference.[3]

While appellants' brief says they "have invented a novel and highly successful process for forming full color images by diffusion transfer" it is not expressly stated that the success is to be attributed wholly to what is disclosed in the present application. It was stated at oral hearing that the present invention does not use any new element, material, or processing solution but resides in the combination of such old elements to produce a new result. We will now quote the passages from the specification which more

---

3. That patent states (col. 5) that the developing function can be *insulated* from the dye molecule, as disclosed in the joint application of Blout and Rogers, serial No. 485,840, filed Feb. 3, 1955. That application was here on appeal in In re Blout and Rogers, 333 F.2d 928, 52 CCPA 751 (1964). Blout and Rogers patent issued June 7, 1966, No. 3,255,001.

fully explain the gist of the invention, deferred diffusibility (all emphasis ours):

As noted hereinabove, multicolor positive images are formed *in accordance with this invention by suitable control of the diffusibility or availability for diffusion of color-providing substances* associated with at least the inner photosensitive layer or layers to other photosensitive layers of an integral multilayer photosensitive element or to the image-receiving layer. This control of the availability of color-providing substances may be described as "deferred mobility", "deferred diffusibility" or "retarded mobility." *Such control of the nonimmobilized color-providing substances is necessary to insure that they do not participate in the development of the latent color image in a photosensitive layer or stratum other than that with which they are associated.* This is particularly essential where the nonimmobilized color-providing substance is capable of developing exposed silver halide. * * * Various mechanisms may be utilized to create the desired deferred diffusibility of the color-providing substances, and a particular integral multilayer photosensitive element may utilize the same or *several different mechanisms for creating the desired deferred diffusibility* in the several layers.

\* \* \* \* \* \*

In general, it may be stated that the desired deferred diffusibility of color-providing substances may be obtained by two types of processing. In one, the latent color record images in the several emulsion layers are substantially simultaneously developed prior to the time the nonimmobilized color-providing substances in unexposed areas achieve the requisite diffusibility. In the second type of processing, the integral multilayer photosensitive element is processed layerwise, one emulsion layer being developed and the color-providing substances associated therewith, but not immobilized by development, rendered diffusible to the

image-receiving layer substantially prior to the time development and diffusion occurs in another layer. In certain instances, an integral multilayer photosensitive element may be so constructed as to utilize both types of processing techniques.

It may be helpful to note that since the whole object is to get a good color image with a single processing solution, spread just once between the monopack and the image-receiving layer according to the Polaroid method, the *process* which results depends entirely on the construction and the ingredients of the monopack and the image-receiving layer and the chemical make-up of the processing solution. Once they are so made as to accomplish the desired result, the process is inherent in them.

We here reproduce claim 52, stated to be the broadest of the process claims on appeal, the italicized portions being from appellants' brief which says they are the portions primarily relied upon to establish patentability. We have broken the claim into its three main process steps and have capitalized the key words of those steps. The reader who has followed our opinion thus far will be interested to note that the claim makes no mention of deferred diffusion, which should not be confused with imagewise immobilization, one of the italicized passages, though it is not contended there is anything new in it.

52. A process of forming positive transfer images in color comprising the STEPS of:

EXPOSING an integral, multilayer, photosensitive monopack element comprising a support carrying a plurality of continuous, coextensive, superposed photosensitive silver halide emulsion layers, each said emulsion having associated with it a color-providing substance selected from the class consisting of an image dye and an intermediate for said image dye, each said silver halide emulsion being sensitized to different portions of the spectrum,

DEVELOPING each of said emulsions, *immobilizing in developed areas, as a function of said development, said color-providing substance associated with each said emulsion thereby providing in undeveloped areas of each said emulsion an image-wise distribution of nonimmobilized, diffusible color-providing substances,*

TRANSFERRING by imbibition at least a portion of each of said image-wise distributions of nonimmobilized, diffusible color-providing substance to *a single, superposed image-receiving layer* to impart thereto a plurality of dye images thereby providing a positive, multicolor image, *said development and said transfer being effected by the application of a single liquid composition.*

Allowed claim 56 and 12 other process claims depend from claim 52. It is illuminating to read the allowed claim:

56. A process as defined in claim 52, wherein said permeation of said integral multilayer, photosensitive element proceeds substantially layerwise, so that development of an outer emulsion layer is substantially completed and diffusion of the color-providing substance associated with undeveloped areas is at least partially completed prior to substantial permeation and development of the next inner emulsion layer by said liquid composition.

In allowing it, the board pointed out that it is limited to control of diffusibility by layerwise permeation, which, the board said, "the art of record * * * does not suggest * * *."

As appellants' brief correctly points out, the issues require an adjudication of the obviousness of each of the 30 appealed claims in view of the prior art but before we can do this we have to deal with Point 2 of that brief raising questions as to whether some of the references underlying the rejection are, in law, available as prior art. This question, as argued, falls into two parts.

### What References are "Prior Art"— Part I

 This first aspect of the question involves the issue recently before the United States Supreme Court in Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965). The Land, Rogers '606, and Yutzy patents were all *copending* with the application on appeal. The statutory ground of rejection involved in this question is 35 U.S.C. § 103 obviousness. Though appellants concede such references are "prior art" under section 102, they raised the old question whether, in view of the unavailability of the contents of pending applications under 35 U.S.C. § 122, the patents issuing thereon are available as prior art *to show obviousness under section 103,* as of their *filing* dates in the United States. See 35 U.S.C. § 102(e). Appellants held this question open in their brief, filed May 7, 1965, because Hazeltine was then pending before the Supreme Court. December 8, 1965, the point was decided adversely to appellants. Patents *otherwise available* as references may be used singly or combined as of their U. S. filing dates to support section 103 rejections though copending with the application at bar. We so held in In re Harry, 333 F.2d 920, 51 CCPA 1541 (1964). With respect to this case, that makes Yutzy clearly available as a reference, no other question being raised as to its availability.

 As to the Land and Rogers '606 references, however, appellants raise the second part of the question about availability, based on our decision in In re Blout and Rogers, 333 F.2d 928, 52 CCPA 751 (1964). They admit that they did not argue this point of law before the board, nor could they have done so as *Blout and Rogers* was not decided until more than four months after the board decision. The solicitor's brief objects to our considering it on the usual ground that we do not generally consider points not raised below, citing In re Herthel, 174 F. 2d 935, 36 CCPA 1095; In re Panagrossi et al., 277 F.2d 181, 47 CCPA 904, and In

re Soli, 317 F.2d 941, 50 CCPA 1288. We find nothing in those cases or in the two other cases cited in *Herthel* which precludes us from dealing with this point of law. In none of those cases was it a point of law that we declined to consider but rather such things as the interpretation of a word (*Herthel*), the factual significance of a claim limitation, a question of operability, the construction of a claim (*Panagrossi*), and the propriety of actions of the examiner to which response could have been made in the Patent Office (*Soli*). Generally speaking, we decline to consider questions which could and should have been raised in the Patent Office so that we have the benefit of the views of its trained personnel on matters within their special competence and so that the Patent Office has the opportunity to furnish its position as expert on technical questions, the interpretation of references, applications, and the like. We will nevertheless consider a question of law, such as the availability of a reference, which is necessary to the determination of patentability. In re Schoenwaldt, 343 F.2d 1000, 52 CCPA 1258. Indeed, we believe we are in a position to interpret our own opinion in *Blout and Rogers* without the benefit of the views of Patent Office tribunals. The solicitor is just as free to argue his views as he is when they have been considered below. We therefore proceed to a consideration of the question raised.

*What References are "Prior Art"—Part II Joint Applicants' Own Sole Patents*

As we recently pointed out in In re Hilmer, 359 F.2d 859, 879, 53 CCPA 1287,

> Much confused thinking could be avoided by realizing that rejections are *based* on statutory provisions, not on references, and that the references merely supply the *evidence* of lack of novelty, obviousness, loss of right or whatever may be the ground of rejection.

The ground of rejection Land and Rogers '606 are cited to support is section 103 obviousness. These patents did not issue until several years after the instant application was filed.[4] They are being used as references as of U. S. filing dates which antedate the joint appellants' filing date. The only basis for so using a U. S. patent is section 102(e):

A person shall be entitled to a patent unless—

> (e) the invention was described in a patent granted on an application for patent by another *filed in the United States before the invention thereof by the applicant* for patent * * *. [Emphasis ours.]

"Another" clearly means another than "the applicant[s]." In the final rejection, the examiner appears to have assumed availability of the Land and Rog-

4. These two references were first cited in this application in the final rejection of June 7, 1961. The Land patent had issued about five months and the Rogers '606 patent about one month prior thereto. All claims were rejected on *three grounds*, the first two being initially stated as "unpatentable over either the disclosure or the claims of one of the newly cited patents to Land and Rogers * * * this ground of rejection alone or further taken together with one of Martinez, the White patents, Rogers (668) and Yutzy." The examiner said he "found nothing patentable over the disclosure of these two patents to different inventive entities." He cited no statute as the basis for this rejection or as warranting the use of the newly issued, new- ly cited patents as references. He merely justified it on the basis they were to *"different inventive entities."* He then proceeded at greater length to expound his rejection *on the claims* of *either* Land or Rogers '606, referring to the granting of the patents to the *assignee* of the present case and to "an extension of the patent monopoly." Though he never referred to double patenting, that must have been what he had in mind as the ground of rejection. The third ground, no longer asserted, was failure to comply with section 112 in failing to point out the invention. On the availability issue, we are concerned only with the section 103 rejection, not with double patenting.

ers '606 patents *as prior art* on the ground Land and Rogers, *individually,* were "another" with respect to the same persons as *joint* applicants. The first Answer took it for granted. The second Answer on the first remand merely pointed out the specific filing dates antedating that of the present application. The third Answer on the second remand to consider amendments again seems to have assumed availability as prior art and the board clearly did likewise. Additionally, in explaining why it found it unnecessary to rule on the double patenting rejection, which the examiner had retained throughout, the board made the express statement that the portion of Rogers '606 relied on by it "is available as prior art." [5] This could only have been on the basis of filing date and based on section 102(e).

Subsequent to the board decision herein, we handed down our decision in *Blout and Rogers* wherein, on the facts there presented to us, *we held unanimously that the Rogers sole '606 patent was "not properly a reference" against the Blout and Rogers joint application* filed February 3, 1955, which was after the March 9, 1954, filing date there accorded to Rogers '606 for the disclosure relied on but more than six years prior to the issuance of Rogers '606. We also commented that the same Rogers, one of the joint applicants, was not "another" within the meaning of section 102(e), though the opinion does not expressly refer to the statute except by quoting that key word from it in the course of discussing the dispute in that case, which revolved around "Rule 131 affidavits."

The solicitor seeks to distinguish *Blout and Rogers* on the ground that in that case the portion of Rogers '606 relied on was *not claimed* and that we held the unclaimed matter was not prior art

whereas here (a) it is not *alleged* the subject matter relied on is not claimed and (b) in point of fact it is claimed. We see no legal significance in these alleged distinctions *with respect to a section 103 rejection.* Claiming in the reference has relevance on a double patenting issue but it has been settled ever since Alexander Milburn Co. v. Davis-Bournonville Co., 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651 (1926), wherein the rule of section 102(e) originated, that the disclosure in the reference is available as prior art whether or not the disclosed subject matter is claimed. See In re Hilmer, supra, at 359 F.2d pages 862 and 877. That is the only effort the Patent Office makes to distinguish *Blout* and we think it must fail.

As to the soundness of the *Blout* rule, appellants cite a number of cases showing that it is elementary that the copending application of the *same* inventor entity is not "prior art," namely, In re Heinle, 342 F.2d 1001, 52 CCPA 1164 (1965), Weatherhead Co. v. Drillmaster Supply Co., 227 F.2d 98 (7th Cir. 1955), Old Town Ribbon & Carbon Co. v. Columbia R. & C. Mfg. Co., 159 F.2d 379 (2d Cir. 1947),[6] and Ex parte Lemieux, 1957 C.D. 47, 115 USPQ 148. In the last case the Board of Appeals, in a well-reasoned opinion, cited Ex parte Powell and Davis, 37 USPQ 285 (Bd.App.1938) where it was held applicants' *own* British specification, published a few weeks before the filing of their application, was not prior art and concluded that subsequent legislation had not altered that rule, that the reference asserted to show *prior* art must disclose the work of someone *other* than the applicant. For two additional cases wherein this court recognized that rule, see In re Land, 109 F.2d 246, 27 CCPA 863, and In re Land, 109 F.2d 251, 27 CCPA 869 (1940), where the court said

5. This was because the Rogers '606 specification had originated in various parent applications with different filing dates. The final application was filed *after* appellants filed, July 14, 1958, but as a continuation-in-part of others filed March 9, 1954, and June 29, 1955, *prior* to ap-

pellants' filing date. The last two are the filing dates used.

6. We believe this case is not in point on this issue because the Foster reference patent, which was copending, involved no inventor in common with the patentees of the patent in suit, Lewis and Menihan.

Land's *own* prior filed copending patent could be used only for what it claimed, i. e., in support of a rejection for double patenting.

There appears to be no dispute as to the law that A is not "another" as to A, B is not "another" as to B, or even that A & B are not "another" as to A & B. But that is not this case, which involves, as did *Blout*, the question whether either A or B is "another" as to A & B as joint inventors under section 102(e).

In re Middleton and Reynolds, 319 F.2d 552, 50 CCPA 1479 (1963) is also discussed by appellants and the solicitor, the latter attempting to use it to take this issue from us on the ground *Middleton* was decided prior to the board decision herein, and therefore this question could have been considered below. However, it is not a parallel case to *Blout*. The rejection there, of a Middleton and Reynolds application, was based on section 102(b), the Middleton sole patent being cited as a one-year time-bar by reason of its *issuance* a year before the joint applicants' filing date. We held it was not available as a reference for that purpose because the applicants *were entitled to a filing date prior to the date of the patent*. While our opinion quotes from *Lemieux* and makes some general statements about the invention of the reference being applicants' own, it is dictum and it is clear that neither the issue here nor section 102(e) was involved.

Dealing, as we are, with a section 103 rejection and with references in support of that rejection alleged to show *prior art* to appellants by virtue of section 102 (e), it behooves us to consider the fundamental statutory basis of the rejection. In Hilmer we reviewed the history and meaning of section 102(e) (359 F.2d 859, at 875) and its origin in the *Milburn* case wherein Whitford's patent was invalidated on the ground that Clifford's patent, containing a full description of it earlier than any date of invention claimed by Whitford, was *evidence* that Whitford was not the first inventor. The statutory basis of that decision was that Whit-

ford's invention was not patentable because "known * * * by others in this country, *before his* invention" (emphasis ours), under that part of R.S. 4886 which is now 102(a). The "other" in the *Milburn* case was Clifford, a total stranger to Whitford.

The salient fact in Milburn was that there was conclusive evidence that his invention was known to others *before he claimed to have made it* and there was no countervailing evidence at all. What he had invented lacked *novelty*, to put it one way, or he was not the *first* inventor, to put it another. The sole evidence was Clifford's patent application. If that application had said, in the course of describing another invention on which Clifford got his patent, that it was describing in addition an invention of Whitford, which would more resemble the case we had in *Blout*, it would not have been evidence that Clifford, or anyone else, knew the invention Whitford made *before* he made it. On the contrary, it would show Whitford made his invention before Clifford described it. We repeat what we pointed out in *Hilmer*, that the statutory basis for the finding of unpatentability in *Milburn* was lack of novelty, as presently embodied in section 102(a). What Whitford claimed was known by others (Clifford, at least) before the date of his invention.

In a rejection today under the 1952 Patent Act, a so-called "section 102(e) rejection" is equally predicated on lack of novelty and 102(a) if the reference *fully* describes the invention; if it is only *partially* described, because of a difference, then it is based on section 103 into which must be read the *prior* art outlined in 102 which supplies the evidence of obviousness. In the first case the evidence shows the invention was old and in the second that it was obvious, *at the time the applicant or patentee at bar made his invention*. The rejection is *based* on 102(a) or 103, however; 102 (e) merely makes the evidence in the form of a "reference patent" available, as before 1953 the rule of the *Milburn* case made it available.

The significant words in 102(a) are "known or used by *others* * * * before the invention thereof by the applicant" and the parallel words in 102(e) are "application for patent. *by another* * * * *before* the invention thereof by the applicant" (emphasis ours). These are the key words on which resolution of the present problem turns. The real issue is whether *all* the evidence, including the references, truly shows knowledge by another *prior to the time appellants made their invention* or whether it shows the contrary. It is a question of fact.

On problems of this kind, thinking seems to have fallen into the following stereotype: A U. S. patent is a "prior art reference" under 102(e) as of its filing date; a "reference" can be overcome only by "swearing back" of it under Rule 131; Rule 131 requires a showing of facts which establish a reduction to practice before the date of the reference, or prior conception coupled with a reduction to practice by diligence; a patent to the *same* applicant or applicants is recognized as incapable of being such a reference because it does not show knowledge by "others" but a *sole* applicant or patentee and *joint* applicants or patentees are separate or different "legal entities" and either is treated as "another" relative to the other (until *Blout and Rogers* raised a question about it). Therefore, joint applicants A and B must "overcome" a reference patent to A or to B and the *only* way one can overcome a "reference" is by complying with *all* of the requirements of Rule 131.[7]

Rule 131, however, is only one way of overcoming a reference, as close reading of its language, and of broader Rule 132, will amply demonstrate. *If* Rule 131 is complied with, the reference "shall not bar the grant of a patent" but nothing is said restricting an applicant to compliance with its specific terms as the *only* way to demonstrate that a reference does not disclose knowledge by "others" *prior* to an applicant's invention but discloses, instead, knowledge by others of applicant's own invention acquired *after* —necessarily after—he made it. Such a state of facts is wholly compatible with the novelty and unobviousness of an applicant's invention under sections 102 and 103, notwithstanding its *disclosure* in a "reference" patent having a filing date earlier than the applicant's. There is no necessary relation between the order of making inventions and the order of filing applications on them.

We therefore approach the question of the availability of the Land and Rogers '606 patents realistically for what it is, a problem of evidence and a question of fact as to what disclosure is relied on in support of the rejection and who invented the subject matter disclosed. We are not concerned with any affidavits under Rule 131 as there are no affidavits at all in this case, unlike *Blout and Rogers*. As in that case, however, we are dealing with inventors who worked closely together for their common assignee, Polaroid, and with a joint application rejected on patents issued to an individual inventor who is one of the joint inventors. The application and the reference patents all flowed from the same research out of the same laboratory, were prepared by the same attorneys, are complex, lengthy, interrelated, and contain extensive cross-

---

7. The only statement made by the board on this score was that Rogers '606, "in the absence of a Rule 131 affidavit, is available as prior art." On rehearing, it repeated this dogma. In the *Blout and Rogers* case, supra, "Rule 131 Affidavits" were filed but ignored by the Patent Office because not deemed in full compliance with the rule. We deemed them sufficient, however, even though they did not comply with the rule, to show that the invention disclosed in Rogers '606 was not that of "another" *but that of Blout and Rogers,* the applicants against whom the reference was cited. (See, however, footnote 10, infra.) In addition, the Rogers reference patent contained a clear cross-reference under Rule 79 to appellants' application with a statement of what they claimed as their invention, as distinguished from Rogers'. It appears at col. 5, lines 54–61 of the Rogers patent No. 2,983,606, the same reference which is being used herein.

references,[8] a situation bearing no resemblance to the *Milburn* case whence came the law making copending patents available as references, codified in section 102(e).

The question here is not merely whether A or B, individually, is or is not "another" to A & B jointly on a theory of "different legal entities."[9] Of course they are different "entities" in the sense that an invention made jointly by A & B cannot be the sole invention of A or B and vice versa, and certain legal consequences flow from such fact, such as who must apply for patent. But it is inescapable fact, too, that when A applies for a patent jointly with B he still has in his head all the information he had as individual inventor A, the same being true of B. If as individuals they apply for patents on individual inventions during a period when they are working together on their joint inventions, they also have in their several heads full knowledge of what they have done jointly. When the joint and sole inventions are related, as they are here, inventor A commonly discloses the invention of A & B in the course of describing his sole invention and when he so describes the *invention of A & B* he is not disclosing "prior art" to the A & B invention, even if he has legal status as "another."

In short, there are two conditions expressed in section 102(e): (1) the application for the reference patent must have been by one who is legally "another" and (2) the filing date must be "before the invention * * * by the applicant * * *." When the 102(e) reference patentee got knowledge of the applicant's invention from him, as by being associated with him, or, as here, had knowledge of the joint applicants' invention by being one of them, and *thereafter* describes it, he necessarily files the application *after* the applicant's invention date and the patent as a "reference" does not evidence that the invention, when made, was already known to others.[10] Evidence of such a state of facts, whatever its form, must be considered.[11]

8. The application at bar occupies 45 pages of printed record. Land 2,968,554 contains 36 columns. Rogers '606 contains 34 columns. One table of other copending applications in the latter to which cross-reference is made for relevant disclosures contains 33 applications. Additionally there are cross-references to several other applications.

9. In Helene Curtis Industries v. Sales Affiliates, Inc., 233 F.2d 148 (2d Cir. 1956), faced with the problem whether McDonough was "another" as to patentees Evans and McDonough, the court recognized the question as one of first impression under 102(e) and, "in view of the policy considerations involved", refused to commit itself to the interpretation made below that the joint patentees were "another" as to the sole patentee.

10. On reconsidering our opinion in *Blout and Rogers*, wherein it was remarked that "Rogers is not 'another' to Blout and Rogers," we now think that remark to have been unfortunate. The true basis of our decision "that the Rogers patent is not properly a reference against Blout and Rogers" was that the evidence before us showed that the alleged anticipatory disclosure in the Rogers patent was a description of the Blout and Rogers joint invention, *not* the *invention of another*. In that sense only Rogers was not "another," but as a patentee, of course, he was. However the disclosure relied on was not *his* invention, or that of a third party as in *Milburn*, but *the applicants' own invention* which, as against them, could not possibly be *prior* art.

The situation here dealt with was not before us in In re Bowers, 359 F.2d 886, 53 CCPA 1590, and should be regarded as a special exception to statements therein regarding the availability of references under 102(e).

11. In re Stempel, 241 F.2d 755, 44 CCPA 820, was another case in which affidavits "under Rule 131" satisfactorily showed that what the reference disclosed was in fact the invention of Stempel, knowledge of which Amos et al., the reference patentees, had acquired *from him* so that they were not disclosing knowledge by others prior to Stempel's invention. We accepted the affidavits as disposing of the reference even though the precise terms of Rule 131 were not met. As we now see the matter, the proper subject of

What facts does the evidence here show and what is the evidence? Appellants' contention is:

> Even if it be assumed that a copending patent is available as a reference under 35 U.S.C. 103 as of its filing date, it is believed that the Land '554 and Rogers '606 patents are not available as references against any of the appealed claims, for *they are not prior art as to appellants.*

> It is acknowledged by all that neither Land '554 or Rogers '606 *disclosed* the here claimed invention prior to appellants' filing date.

We take this last stated fact to be implicit in the rejection for obviousness under section 103. Appellants continue the argument:

> Here we are concerned with a joint application of Land and Rogers rejected upon an earlier sole application of Land and an earlier sole application of Rogers. The fact that Land communicated the subject matter of the Land '554 patent to Rogers prior to the filing of Rogers' sole application is established by express cross-references to Land's 1950 application * * * [three cross-references are here set forth] of the Rogers '606 patent. Thus, Land and Rogers *jointly* possessed, prior to the filing of their joint application, all of the disclosure in their respective sole applications which is relied upon by the Patent Office. Land and Rogers brought this knowledge with them when they made the invention jointly claimed here. * * Under these circumstances, it is sub-

mitted that appellants are here being rejected upon their own knowledge and disclosures, just as much as if the earlier filed sole applications had been joint applications.

As we understand this last point, it is based on the justifiable assumption that *if* the reference were another joint Land and Rogers application, instead of two individual applications, the rule would apply that an applicant's copending applications or publications are not prior art to him, In re Heinle, 342 F.2d 1001, 52 CCPA 1164; Ex parte Lemieux, 115 USPQ 148, and the reference would be unavailable as not that of "another." [12]

As to evidence to show the determinative facts, appellants say:

> While no formal affidavits have been filed in this application * * * the oaths and formal cross-references in each of the sole and joint applications clearly set forth the facts as to who invented what.

The oaths of the reference patents are not of record and the oath of the application at bar is in usual form for an original application. They are not helpful. We find cross-references in the present application as amended to the application for the Land reference and to the Rogers '668 and '606 references. In Land we find no reference to this application. In Rogers '606 is a general description of and cross-reference to the subject matter of the instant joint application *but* this does not appear to be any part of the disclosure relied on to support the obviousness rejection. In this respect this case is different from *Blout and Rogers.*

inquiry was not compliance with Rule 131 but what the *evidence* showed as to *who* invented the subject matter disclosed by Amos et al. which was relied on to support the rejection.

**12.** It appears to be still an open question under 35 U.S.C. § 103 whether the "prior art" therein referred to is not broad enough to include applicant's admissions about prior art, for example, where he shows or admits that an invention he desires to patent is an improvement upon one of his own inventions, the subject

of another application or copending patent. Compare *In re Simmons*, supra, and consider what the situation would have been had the rejection been framed under section 103, instead of based on "double patenting," on the premise that Simmons' invention was stated to be an improvement on apparatus on which he had filed an application more than a year earlier. The question would then be the *obviousness of the improvements*, which is the same question presented by the double patenting rejection. See also In re LoPresti, 333 F.2d 932, 52 CCPA 75.

While, as the foregoing would indicate, there is much to be said on both sides of the question, our considered opinion is that Land and Rogers '606, on the facts of this case, should be regarded as prior art. It is certainly in accord with the weight of authority [13] to regard Land and Rogers individually as separate legal entities from Land and Rogers as joint inventors, as they would be regarded relative to each other if a Land application were rejected on a Rogers copending patent. It seems to us that the disclosures in their individual applications of their individual inventions are part of the prior art and they seem to admit as much in saying that Land and Rogers brought their knowledge of their individual work, and of each other's work, with them "when they made the invention jointly claimed here." There is no indication that the portions of the references relied on disclose anything they did jointly. Neither is there any showing that what they did jointly was done before the filing of the reference patent applications.

### Merits of the Obviousness Rejection

Against the background of the description of the invention, given earlier, we will very briefly indicate the nature of the reference disclosures relied on.

Land discloses a one-step color photography diffusion transfer process using a negative with emulsions sensitive to three colors, associated color-formers, and insulating layers, a single image-receiving layer, and a single processing solution delivered from a rupturable pod. The solicitor describes the negative as a "monopack" but this is misleading as it is not such a monopack as described above, utilized by appellants. Land's negative is a "screen" wherein the three layers are laid on the base in such a way as to form a grid or dots, each of the red-, green-, and blue-sensitive emulsions being exposed on the surface. At minute *discrete areas* on the negative it is possible to point to superposed *layers* of the three emulsions, as the examiner did in finding complete anticipation before the claims were amended to avoid it, but such layered areas are of minute dimensions considering that the screen is produced by applying strips of emulsion so narrow as to have 250 lines thereof per linear inch. The surface portions participate in picture production and underlying portions do not.

Rogers '606 is also a screen negative diffusion transfer, single processing liquid structure but contains other relevant disclosures. Rogers' contribution is in the use of dye developers. The specification contains frequent cross-references to Land. The portions relied on have to do with single-liquid processing, the mechanism of imagewise color immobilization, and the *prevention* of participation in color image formation of underlying emulsions and associated color substances which, in a screen negative, was considered undesirable. According to the present invention, on the contrary, it is of the essence of the process that all underlying layers do participate in image forming.

Yutzy discloses a process of obtaining a multicolor image by the transfer of color-yielding substances from a multilayer negative or monopack to a single image-receiving layer. He employs imagewise immobilization of color substance, as do all of these processes, but differs from Land, Rogers, and appellants' process in not using single solution processing. Yutzy uses at least three processing solutions and may use as many as six. His process involves keeping all color substances immobilized until development is completed and then releasing them for transfer. The principle of the release mechanism of Yutzy is to

---

13. See In re Ward, 236 F.2d 428, 43 CCPA 1007, and Ex parte Lindeman and Youngs, 107 USPQ 331 (Bd.Appls.1955) although in the latter the cases cited do not appear to support the proposition, in particular this court's In re Beck, 155 F. 2d 398, 33 CCPA 1060 (1946), in which there was no common inventor in the application and reference patent.

utilize color substances which are diffusible in the presence of alkali and thereafter to contact the developed negative with an alkaline image-receiving sheet. The alkali diffuses into the negative and the color substances begin to diffuse.

White is cited for disclosure of emulsion layers sensitized to different regions of the visible spectrum and associated layers of color-providing substance. It is not a transfer process.

Rogers '668 is cited for dye transfer processes in which complete dyes are provided in separate layers or particles of slowly permeable material. It appears to have been relied on as merely cumulative.

We will first dispose of the product claims. At the argument appellants' counsel conceded claims 82–86 to be of doubtful validity and retained in the case pending the decision of the Supreme Court in Hazeltine Research, Inc. v. Brenner. They were rejected on Yutzy taken with White or Land or both. They are directed to the monopack negative element per se. We agree that the products defined would be obvious in view of the references cited against them. The second group of product claims consists of 69 as a main claim and two dependent claims 70, 71. Claim 69 is directed broadly to the complete photographic unit: Monopack, image-receiving layer, connecting means, and single processing liquid in its pod. Appellants say its language is analogous to that of claim 52, quoted above. Hence, it is broad language. Appellants' brief concedes the definition of the monopack elements "comes very close to reading on the multilayer negative of Yutzy as a structure per se if one ignores the functional statements * * * or recitations of the manner of use * * *." The examiner said the general combination is shown in Rogers '606 but the board pointed out it is so shown with a screen-type negative, holding it would be obvious, however, to provide the same combination with Yutzy's monopack and held it obvious on Land or Rogers '606

in view of Yutzy. As to claim 69, we agree. The dependent claims contain further limitations which the board regarded as functional and gave no weight to them. Since claim 71 depends from 70 they have a common limitation in 70 which is, we think, significant. It reads:

> \*– \* \* said color-providing substances associated with at least the inner photosensitive emulsion layers are *adapted to be rendered diffusible* in said liquid composition *only after at least substantial development* of the next outermost photosensitive \* \* \* layer has occurred. [Emphasis ours.]

It is true that the italicized portions are "functional" but we do not regard that as good ground to give them "no weight" in view of the third paragraph of 35 U.S. C. § 112. We give them weight and with this limitation we think claims 70 and 71 are limited to deferred diffusion *built into the structure recited,* thereby being limited to the actual invention disclosed and hence allowable for the same reasons given by the board in allowing claim 56, of which it said: "In our view the art of record as applied by the Examiner does not suggest the process of this claim." We think the same reasoning applies to the product.

We turn now to the process claims. There are only two independent claims. Claim 52, above, from which claims 53–55, 58–61, 63, 64, 66–68, and 90 depend; and claim 73, from which claims 74–76, and 78–81 depend. As we indicated above in footnote 2, the obviousness rejection appears to rest, not on obviousness of the invention as disclosed but on the obviousness of processes of the *breadth* defined in the claims. We may state our conclusion broadly as an agreement with the Patent Office as to those claims which say nothing whatever about what we regard as the invention, deferred diffusion by whatever name it may be called, but disagreement as to the claims which contain reasonably clear limitations thereto, reading the depend-

ent claims, as we must, as including all limitations in the claims from which they depend. ˙We will now sort out the claims.

Claim 52 is reproduced above with the portions appellants rely on for patentability italicized. It will be seen that it recites the steps of exposing, developing, and transferring; that a broadly defined monopack such as Yutzy describes is exposed and developed and that there is imagewise immobilization of color as known to the art; that color is transferred to the image-receiving layer; and that a single processing liquid is used. And that is about all. We agree that the mere putting together of the Yutzy monopack with the Land and Rogers single processing liquid methods, without more, is properly described as obvious. We affirm the rejection of claim 52.

Claim 53 is almost the same as product claim 70 quoted from and discussed above. We think it should be allowed for the reasons given as to claim 70. We do not agree with the board's view that claim 53 merely hints at deferred diffusibility or that it is so broad as to read on Yutzy. We reverse its rejection.

Claim 54 depends from 52, claim 55 from 54, and claims 61 and 63 from 55. Claim 54 calls for at least one color-providing substance having a rate of solution in the processing solution slower than the rate of development of its *associated* silver halide layer. Appellants' brief describes this as a technique "to increase control of each color-providing substance by its own silver halide emulsion, and thus improve color isolation * * *." Claim 55 adds that the control is by a carrier permeated at a slower rate than the light-sensitive emulsion is permeated, 61 calls for carrier *particles in* the emulsion layer and 63 for a *layer behind* the emulsion layer. It seems to us these techniques, which we find in the prior art, have to do with imagewise immobilization, not with deferred diffusion as we understand it. We agree with the rejection of claims 54, 55, 61 and 63.

Claim 58 merely adds to 52 the spreading of the processing liquid according to the Land or Rogers technique and claim 59 the separating of negative and image layers after processing. Claim 60 specifies dye-developer from Rogers '606. We affirm the rejection of claims 58–60.

Claim 64 specifies including color-providing substance in the processing liquid to be associated with the outermost silver halide emulsion. Appellants describe this as a "unique embodiment" of their invention. The rejection of this claim appears to have gone along with that of 52. We find the incorporation of color substance in the processing liquid to be disclosed in Rogers '606 and Rogers '668. The claim says nothing about deferred diffusion. We affirm its rejection.

As to claim 66 the examiner noted that it is "not met by Rogers ['606] alone." The solicitor lists it with claims alluding to deferred diffusion. Deferment appears to be accomplished by using a color-providing substance initially insoluble in the *single* processing liquid specified in parent claim 52 but rendered soluble during processing. Seeing no distinct reason for its rejection we reverse it.

Claims 67 and 68 are drawn to limitations which are to be found in Rogers '606, relating to developing agents. Claim 90 specifies that the dye intermediate of claim 52 is a color coupler. Such is shown in Land. We sustain the rejection of claims 67, 68, and 90. This completes the claims depending from 52.

Independent claim 73 resembles claim 52 but is more limited in specifying Rogers' dye-developers in the monopack, an alkaline processing solution, and the color sensitivities of the emulsions. We thing it unpatentable for the same reasons as claim 52. The claims dependent from it add various other limitations from the prior art and none refers in any way to deferred diffusion. Their rejection is sustained.

## Double Patenting Rejection

We find it unnecessary to pass separately on this rejection which appears to have been retained in the case in the event the Land and Rogers '606 patents were found to be unavailable as prior art. As stated earlier, and as the board viewed the matter, it is simply a narrower aspect of the obviousness question utilizing as a base the claims only of Rogers '606 plus the other prior art instead of the full Rogers disclosure. As to the claims on which we have affirmed the obviousness rejection, it is clearly unnecessary to pass on another rejection. As to the claims on which we have reversed the obviousness rejection, a fortiori this double patenting rejection, predicated on obviousness, would be reversed for the same reasons.

## Conclusion

■ For the foregoing reasons, the decision of the board is reversed as to claims 53, 66, 70, and 71 and affirmed as to claims 52, 54, 55, 58–61, 63, 64, 67–69, 73–76, 78–86, and 90.

Modified.

Judge MARTIN participated in the hearing of this case but died before a decision was reached.

WORLEY, Chief Judge (dissenting in part).

I agree with the reasoning and conclusions of the majority save its reversal of the rejection of claims 53, 66, 70 and 71. I disagree with the majority's conclusion with respect to the latter claims insofar as it appears to proceed on the rationale that the claims are limited to the same aspect of the invention as claimed in allowed claim 56, hence allowable for the reasons the board gave for allowing that claim.[1]

As the majority observes, the disclosed invention is capable of expression in various ways. "Deferred diffusion" is one expression appellants use. What the majority apparently fails to recognize, however, is that there are *several kinds* of "deferred diffusion" disclosed by appellants, as exemplified by the following pertinent disclosure:

Another object of this invention is to provide diffusion transfer-reversal processes wherein *diffusion of the color-providing substances associated with at least one emulsion layer of an integral multilayer photosensitive element to an image-receiving layer is controlled in such a way as to be deferred until at least substantial development of the latent color record contained in said emulsion layer has occurred.*

\* \* \* \* \* \*

In general, it may be stated that the desired deferred diffusibility of color-providing substances may be obtained by two types of processing. *In one,* the latent color record images in the several emulsion layers are substantially simultaneously developed prior to the time the non-immobilized color-providing substances in unexposed areas achieve the requisite diffusibility. *In the second* type of processing, the integral multilayer photosensitive element is processed layerwise, one emulsion layer being developed and the color-providing substances associated therewith, but not immobilized by development, rendered diffusible to the image-receiving layer substantially prior to the time development and diffusion occurs in another layer. In certain instances, an integral multilayer photosensitive element may be so constructed as to utilize both types

---

1. Whether it is proper for the majority to compare those claims with allowed claim 56 is a question upon which it is not necessary to dwell at length. Suffice it to say it is well settled that appealed claims must be judged on their own merits and not on the basis of a comparison with other claims which have been allowed. See In re Margaroli, 318 F.2d 348, 50 CCPA 1400; In re Ashley, 315 F.2d 945, 50 CCPA 1200; and In re McMurry, 230 F.2d 442, 43 CCPA 821.

of processing techniques. (Emphasis supplied)

The "second type" of processing, in which the "integral multilayer photosensitive element is processed layerwise," appears to correspond substantially to that recited in claim 56. The first type of processing,[2] in which the several exposed emulsion layers may all be developed prior to the time diffusion begins to occur, appears to be embraced by the language of claims 53 and 70 as follows:

53. A process as defined in claim 52, wherein said color-providing substance associated with undeveloped areas of *at least* each inner emulsion layer of said multilayer, photosentitive element is rendered diffusible *only* after *at least* substantial development of the next outer emulsion layer has occurred.

70. A photographic product as set forth in claim 69, wherein said color-providing substances associated with *at least* the inner photosentitive emulsion layers are adapted to be rendered diffusible in said liquid composition *only after at least* substantial development of the next outermost photosensitive silver halide emulsion layer has occurred. (Emphasis supplied)

I read those claims, interpreted in light of the disclosure, to allow development of two, or three, emulsion layers, either simultaneously or sequentially, before diffusion begins to occur to any appreciable extent. It is in that regard that the Yutzy reference becomes particularly pertinent. There can be no doubt that the Yutzy reference relied on by the Patent Office does disclose a type of "deferred diffusion." The following excerpts from Yutzy make it clear that he recognized the necessity and desirability of deferred diffusion:

In the broadest aspects of my invention, the objects are accomplished by exposing to a colored subject a photographic element containing at least two silver halide emulsions sensitized to different regions of the visible spectrum and *each emulsion having intimately associated with it a potentially diffusible*[3] *coloring material which is non-wandering during coating and development,* developing the exposed photographic element with a solution of a silver halide developing agent which renders said coloring material nondiffusible only in the regions of exposure and development of the emulsions, rendering the coloring material only in the unexposed regions of the emulsions diffusible and placing the emulsions in intimate contact with an absorbent surface to simultaneously cause the diffusible coloring material in the emulsions to diffuse imagewise into the absorbent surface.

* * * In a three-layer silver halide material for subtractive color photography the blue, green and red-sensitive layers normally contain, respectively, yellow, magenta and cyan dyes or color formers. These dyes or color formers must be such as to be non-wandering during the coating operations and usually during *at least the early stages of negative development.* This is *conventionally* accomplished by any of several means, namely, using very large

---

2. Appellants' specification also states:
 * * * Thus, by *deferred diffusibility* it is intended to cover situations where non-immobilized color-providing substances associated with an inner emulsion are rendered diffusible after at least substantial development of an outer emulsion has occurred but simultaneously with the development of said inner emulsion, *or where development of both said inner and outer*

*emulsion layers has been substantially completed.* (Emphasis supplied)

3. Appellants' specification states:
 * * * It is to be understood that, prior to development, all of the color-providing substances present are considered mobile in that they are potentially diffusible. Various mechanisms may be utilized to create the desired deferred diffusibility of the color-providing substances. * * *

molecules, molecules containing groups which are substantive to gelatin or the vehicle, molecules containing groups which can be mordanted by conventional cation or anion mordants, etc. In my invention, dyes or color formers are selected such that they will not diffuse from layer to layer during coating or negative development, with the additional characteristic that by an appropriate step in the processing they can be made to diffuse easily so that after a negative development the release mechanism can be called into operation so that unaltered dye or color former can thereupon diffuse readily to a receiving sheet which has been placed in contact with the emulsion layers. * * *

* * * *If dyes or couplers are used which diffuse at too early a stage, i. e., during coating or development, then the association between the appropriate dye and silver halide is lost and color separation will not be obtained.* The dyes or color formers may be rendered non-wandering during coating by many techniques which would include mordanting, precipitation with metallic ions, and the like. Similarly, dyes or color formers can be used in chemical combinations, such as esters which are hydrolyzed at an appropriate step in the processing to release the dye or color former as a smaller molecule to wander. * * * (Emphasis supplied)

Those same concepts are expressed in slightly different language in appellants' specification, as noted by the examiner. Indeed, as the examiner pointed out,[4] it

would seem necessary for the operation of any diffusion transfer process of the type disclosed by appellants that diffusion from unexposed areas of the positive image forming material be deferred until development of the exposed regions of the negative has proceeded to a substantial degree. As the board noted:

Claims 53, 54, and 55 hint at the concept of deferred diffusibility *but are so broadly worded as to read on the complete development of all the emulsion layers as in Yutzy prior to rendering the color providing substances diffusible to the image receiving layer.* The Examiner has pointed out where certain details of the claims are found in the prior art and we find no error in the application of the references. * * *(Emphasis supplied)

Appellants do not challenge the board's analysis of the scope of those claims, but only assert the board erred "in failing to give weight to the express requirement in these claims that *both development and transfer must be effected by a single liquid composition.*" It seems to me the limitations in claims 53, 70 and 71 do not impart patentability for the same reasons expressed by the majority with respect to claims 52 and 69, from which the former are dependent.

As for claim 66, it reads:

66. A process as defined in claim 52, wherein said color-providing substances are initially insoluble in said liquid processing composition, said process including the step of rendering said nonimmobilized color-providing substances soluble in said liquid pro-

4. The examiner stated:
 * * * It appears that the problem is solved generally in the *same way* by *both* appellants and Yutzy. Both defer diffusion of the color-providing substances until the development of the negative image which supplies the control mechanism has at least gone through its early stages. * * * the only critical mechanism evident in the case is the one exemplified in any of the Rogers or Land patents. That is to say, the concept of providing a color-

providing substance which will diffuse only after at least early stages of development of negative image is considered a feature of any one of the last mentioned references. The deferred diffusion of substances such as dye developers is inherent in the monochromatic process specifically disclosed by Rogers (606), for instance. How else is the lack of transfer from exposed areas of negative emulsion controlled? * * *

cessing composition whereby they may diffuse to said image-receiving layer.

The specification discloses several techniques by which those limitations apparently are accomplished, among which are:

(1) incorporating the color material in a "high-boiling, water- and alkali-immiscible liquid," whereupon contact by the processing liquid renders the color material "increasingly diffusible by a differential extraction process;"

(2) employing the color material in particle form, whereby it "is more slowly dissolved than if molecularly dispersed, thus permitting one to effect the desired deferred diffusibility;"

(3) associating the color material with a "temporary mordant" which renders it "temporarily insoluble;" subsequent contact with the processing solution hydrolyzes off the "insolubilizing substituent" and renders the color material diffusible;

(4) employing an auxiliary developer, the oxidation product of which reacts with unoxidized dye developer while the latter "is still in an immobile condition, i. e. prior to its being solubilized by the liquid processing composition," thereby preventing diffusion of the reacted dye developer from exposed areas.

Appellants nowhere present an argument for the separate patentability of claim 66. The examiner and board have pointed out that many of the above techniques encompassed within the broad language of claim 66 are suggested by one or more of the Land, Rogers, or Yutzy references. Land, for example, mixes color material and developers in a high-boiling solvent "which has been found beneficial for introducing and maintaining coupler materials within emulsion layers;" the developers employed possess "low solubility in alkali but have good solubility in a high-boiling-point solvent." Rogers, in addition to disclosing the use of dye developers "in relatively large particle sizes," discloses "immobilizing" couplers "through the use of high-boiling-point solvents." As noted earlier, Yutzy discloses use of mordants, or esters "which are hydrolyzed at an appropriate step in the processing to release the dye or color former as a smaller molecule to wander." The use of an auxiliary developer described in (4) above is claimed more specifically in such claims as 67, 68, and 76 which the majority does not allow. I see no valid reason for reaching a different conclusion with respect to claim 66.

I would affirm the decision below in its entirety.