**Application of Erwin F. SCHOENE-WALDT.**

**Patent Appeal No. 7345.**

United States Court of Customs
and Patent Appeals.

April 22, 1965.

Smith, J., dissented.

Frank M. Nolan, New York City (Albert W. Rinehart, Washington, D. C., I. Louis Wolk, Rahway, N. J., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Raymond E. Martin, Washington, D. C., of counsel), for the Comr. of Patents.

Before RICH, Acting Chief Judge, MARTIN, SMITH, and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.*

MARTIN, Judge.

This appeal is from the board's affirmance of the rejection of the single claim in an application, serial No. 541,299, titled "Chemical Compound and Process of Preparing the Same," filed by appellant on October 18, 1955.

The invention is an ester derivative of hydrocortisone. The claim reads:[1]

"1. $\Delta$ [4]-pregnene-11β,17α,21-triol-3,20-dione 21-hemisuccinate having the following structural formula:

$$\underset{21}{H_2COCCH_2CH_2COH}$$

The compound is produced by reacting succinic anhydride with hydrocortisone in a pyridine medium at room temperature for 22 hours. The succinic anhydride "selectively" esterifies the hydroxyl on the #21 carbon.

Since only one carboxyl group of the two available in succinic anhydride reacts, the product derivative is called a half- or hemisuccinate, or a 21 hemisuccinate, which name also indicates the

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge Worley, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Certain oxygens and hydrogens have been rearranged for clarity, and the numbers 11, 17 and 21 have been added to identify certain carbon atoms.

position of the ester group in the molecule. We shall refer to the claimed compound simply as hydrocortisone hemisuccinate. Also, it should be noted that in referring to hydrocortisone hemisuccinate, we mean the derivative in which the hydroxyl on the #11 ring carbon is in what is known as the β steric configuration. We shall also have occasion to refer to that 11-hydroxyl in the α configuration.[2]

The sole disclosure of the utility and properties of this compound is stated by appellant as: "When * * * [hydrocortisone hemisuccinate] is administered parenterally, it is characterized by an extremely rapid onset of hydrocortisone action making it a drug of choice in cases of medical emergency."

 Both appellant and the solicitor present preliminary questions concerning the two references in the record.

They are:

| Minlon | 2,656,366 | Issued Oct. 20, 1953 |
| | | Filed July 27, 1950, and |
| Murray et al. | 2,861,088 | Issued Nov. 18, 1958 |
| | | Filed April 10, 1952. |

Comparing the dates of these references with appellant's filing date of October 18, 1955 it is clear that the Murray et al. patent (hereinafter Murray) was copending. Appellant contends that 35 U.S.C. § 102(e), under which the effective date of a domestic patent is its filing date, applies *only* to references which are fully anticipatory in nature, and not to references used in a section 103 rejection, contrary to this court's holding in In re Harry, 333 F.2d 920, 51 CCPA 1541.

In response the solicitor contends that since appellant did not raise that issue before either the examiner or Board of Appeals, it is not properly before this court, especially in view of In re Panagrossi, 277 F.2d 181, 47 CCPA 904, 906, and In re Wohnsiedler, 315 F.2d 934, 50 CCPA 1153. Appellant's reply brief in rebuttal argues that since this is solely a question of law, rather than a question of technical facts, the issue may be raised here for the first time.

We do not think the solicitor is correct in his contention. The section 102(e) question may be properly raised here for the first time because we must determine whether the reference is available. The particular question, whether we may consider the Murray reference, must be settled prior to determining the legal effect of the disclosure of that reference.

We find no compelling reason to overrule our recent decisions in In re Harry, supra, or In re Kander, 312 F.2d 834, 50 CCPA 928, In re Zenitz, 333 F.2d 924, 52 CCPA 746, or our earlier decision in In re Gregg, 244 F.2d 316, 44 CCPA 904, or go contrary to the Court of Appeals of the District of Columbia circuit, Hazeltine Research, Inc. v. Ladd, 340 F.2d 786, cert. granted 380 U.S. 960, 85 S.Ct. 1108.[3] Thus Murray being available as prior art for a section 103 rejection, we look next to see whether that section is satisfied.

 Minlon describes production of *cortisone* hemisuccinate by the same proc-

**2.** Karrer, in his text on Organic Chemistry, Elsevier Pub. Co., N.Y., 3d English Ed. (1947), states at p. 706: "* * * It has become customary to give the prefix α to substituents which, in the projection formula of this hydrocarbon [a steroid], lie behind the plane, and β to those in front of the plane. * * *" This is in agreement with appellant who stated in oral argument "in that 11 position * * * the hydroxyl is in the α position * * * as chemists say, is behind the carbon atom of the molecule."

**3.** See Detrola Radio and Television Corp. v. Hazeltine Corp., 313 U.S. 259, 265, 61 S.Ct. 948, 85 L.Ed. 1319, and also Judge Hand's views consistent with that case in The Western States Machine Co. v. S.S. Hepworth Co., 147 F.2d 345, (2d Cir. 1945); Old Town Ribbon Co. v. Columbia Ribbon Mfg. Co., 159 F.2d 379 (2d Cir. 1947). But see, Robinson Aviation, Inc. v. The Barry Corp., 106 F.Supp. 514 (D.Mass.1952). It is only dictum in In re Gray, 136 F.2d 742, 30 CCPA 1175, with regard to the Gray and Elger patents, which appears inconsistent with In re Harry, supra.

ess as appellant uses with hydrocortisone. Cortisone differs from hydrocortisone in having a keto group [O=C<] rather than a hydroxyl group [HOC<] at the 11 position. The hemisuccinate of cortisone is found by Minlon to be four times as soluble in water as the esters of the prior art, such as cortisone acetate. Alkali metal salts of Minlon's acetate esters are between 50 to 1500 times as soluble. The facility of injection of an aqueous solution of a drug which is water-soluble is contrasted by Minlon to the "evident disadvantages" of the prior art drugs. The solubility property of the ester derivatives makes them "useful in the cortisone therapy of arthritis and related diseases, particularly where the drug had to be injected intramuscularly."

Murray discloses, as the examiner correctly stated, "various esters of hydrocortisone and epihydrocortisone (the 11 α-hydroxy isomer)." The examiner specifically pointed to Example 8 of Murray as disclosing "the half ester of succinic acid (hemisuccinate) as an exemplary 21-ester of hydrocortisone." Despite this statement of the examiner, and a rejection of the claim as "unpatentable over Murray et al., alone, or in view of Minlon," the board considered that the examiner meant the rejection to be based only on the combination of references. Since we consider the latter rejection to be sound, we need not discuss whether there is before us a rejection on Murray alone.

Appellant's contentions are that Murray's Example 8 is a "shotgun" disclosure, since thousands of compounds are suggested therein; that Example 8 is drawn to the inactive 11α epimer; that it is unclear whether a half or di-ester is formed, or whether the ester is formed solely at the 21 position; and that "no utility" for the esters is disclosed in Murray except "as intermediates for cortisone esters."

All but the last contention can be disposed of by considering what Murray discloses in Example 8:

"Example 8

"21 - benzoxy - 11α,17α - dihydroxy - 4 - pregnene - 3,20-dione and 11α,21 - dibenzoxy - 17α - hydroxy - 4-pregnene - 3,20 - dione

"*Following the procedure of Example 6,* using the equivalent proportion of benzoyl chloride in place of trimethylacetyl chloride produced 21-benzoxy-11α,17α-dihydroxy - 4 - pregnene - 3,20 - dione and 11α,21 - dibenzoxy-17α-hydroxy-4-pregnene - 3,20-dione.

"*Other mono-esters* and di-esters *of 11α,17α* 21-trihydroxy-4-pregnene-3,20-dione *and* mono-esters *of 11β,* 17α-21-trihydroxy-4-pregnene-3,20 - dione *are prepared according to various acylation procedures such* as *illustrated in the examples, or by reaction with* ketene, ketenes of selected acids, selected acids, *acid anhydrides,* or acid chlorides, *in an organic solvent such as pyridine or the like. Representative* 21-acyloxy-11α,17α-dihydroxy-3-pregnene-3,20 - diones, 11α,21 - diacyloxy - 17α - hydroxy - 4-pregene - 3,20 - diones, and *21 - acyloxy - 11β,* 17α-dihydroxy - 4 - pregnene - 3,20 - *diones thus-prepared include one to eight carbon atom carboxylic acid acyloxy esters* of saturated or unsaturated aliphatic, carbocyclic, cycloaliphatic, aryl, arylalkyl, alkaryl, mono, di or polycarboxylic acids which form ester groups *such as, for example,* formyloxy, acetoxy, propionyloxy, dimethylacetoxy, trimethylacetoxy, butyryloxy, valeryloxy, hexanoyloxy, heptanoyloxy, octanoyloxy, benzoxy, phenylacetoxy, toluoyloxy, napthoyloxy, cyclopentylformyloxy, β-cyclopentylpropionyloxy, acrylyloxy, cyclohexylformyloxy, the *half and di-esters of* malonic maleic, *succinic,* glutaric and adipic *acids, and the like.* The acids may also contain non-interfering substituents, such as mono or poly halo, chloro, bromo, hydroxy, methoxy, and the

like, if desired." [Emphasis supplied.]

We have underlined the portion of the Murray disclosure relied on by the examiner. It includes relatively few compounds. Contrary to appellant's contention, both the 11α and 11β compounds are disclosed therein; the structural formula shown in column 1 of the patent is consistent, showing the 11-hydroxyl in the β configuration. Further, there is nothing of record to show the 11α epimer, even were Murray drawn only to that species, to be inactive.

The contention that there may be esterification at the 11 or 17 position as well as the 21 position in Murray is not tenable. Example 8 discloses that "21-acyloxy * * * diones thus-prepared include * * * half * * * esters of * * * succinic * * * acids." [Emphasis supplied.] Further, the procedure used in Example 8 is stated to "Follow * * * the procedure of Example 6," which is disclosed to be the reaction of the components in a pyridine medium at room temperature for 24 hours. Under "Other mono-esters," Example 8 clearly teaches acid anhydrides to be reacted in a pyridine medium. Since the same conditions are said by appellant to lead to "selective" esterification at the 21 position, such a contention of possible reactions at other positions is not well taken.

Apparently the board felt that the Murray disclosure of compounds "thus-prepared" really meant not that they *were* prepared but *could be* prepared if so desired. While the board apparently did not consider whether the Murray form of listing the compounds was an enabling disclosure of the claimed compounds, any doubt that one of ordinary skill in the art would consider it probable that the hemisuccinate would be more water-soluble is removed by the Minlon disclosure of the increased water solubility arising from the similar esterification of cortisone. In looking to see if the water solubility property could be expected, we give the claimed compound the benefit of an arguendo assumption since its solubility property was not originally disclosed. We do not consider that the lack of disclosure in Murray of an anti-inflammatory activity is persuasive of unobviousness since (1) as appellant argued below in another connection,[4] the properties of hydrocortisone and esters thereof are known, and one skilled in the art would recognize that the 21-hemisuccinate would possess the activity of hydrocortisone, (2) Minlon teaches the 11-keto hemisuccinate analog has such activity, and (3) although unnecessary, the solicitor has requested we take judicial notice of two standard reference works[5] which show the similar medical use of both hydrocortisone and cortisone.

For the above reasons we *affirm* the board.

Affirmed.

SMITH, Judge (dissenting).

The majority opinion, like the decision of the board, is predicated upon *a combination* of the Murray et al. reference and the Minlon reference. It is clear from the majority opinion that it is this

---

4. Appellant filed a Rule 131 affidavit showing completion of the invention in the United States prior to May 28, 1954 in an effort to remove a patent to Pinson et al., 2,786,835, issued March 26, 1957 the parent application to which was filed May 28, 1954, and a patent to Beal, 2,842,542, issued July 8, 1958 on an application filed June 20, 1955. Example 1 of Pinson et al. and Example 17 of Beal showed the claimed compound. The examiner found the affidavit insufficient in that "said affidavit does not disclose a utility for the 21-hemisuccinate of hydrocorti-

sone." The board reversed, finding the affidavit sufficient, relying on In re Wilkinson, 304 F.2d 673, 50 CCPA 701, which had not been available to the examiner.

5. The solicitor requested we take judicial notice of The Merck Index, 6th Ed., 1952 under the listing of "Cortisone" and "17-Hydroxycorticosterone," and Physicians Desk Reference, 1954 Edition, copyrighted 1953, Medical Economics, Inc., Rutherford, N. J., pp. 483–485, particularly 485, under "Hydrocortone acetate."

*combination* which the majority relies upon in finding appellant's invention to be unpatentable under 35 U.S.C. § 103. My disagreement with the majority stems from what I understand to have been the purpose of the words "at the time the invention was made" in section 103.

While on the present record Murray et al. and Minlon are prior art, the point at which I disagree with the majority is that there is nothing in the record except appellant's invention which suggests the *combination* of the two references upon which the majority relies. I question whether this record properly supports a rejection for obviousness under section 103 when it was appellant's invention and only appellant's invention which taught this *combination* to the art. There is no question but that under 35 U.S.C. § 102(e), a patent which "*describes*" the invention for which a patent is sought speaks as of its filing date. In re Harry, 333 F.2d 920, 51 CCPA 1541. In other words, to the extent Murray et al. described appellant's invention it is a proper basis for the rejection. I do not take this to mean, however, that the partial description of appellant's invention as found in Murray et al. may be "combined" by hindsight with another partial description found in Minlon to support a rejection for obviousness under section 103.

The clear intent expressed in section 103 is that in such a situation as the present the obviousness of the claimed invention must be determined solely from the prior art teachings. This excludes the use of appellant's invention in making selections of the particular portions of the references and combining them to provide a combination which by hindsight can be said to be "obvious." In other words, we must make the determination required by section 103 without the benefit of appellant's invention.

As pointed out in appellant's brief:

"Appellant's claim defines a new compound which when administered parenterally is characterized by an extremely rapid onset of hydrocortisone activity, making it a drug of choice in case of medical emergency. Neither the compound nor its utility are taught by the disclosures of Murray et al. in view of Minlon. Murray et al. discloses in shot gun fashion thousands of esters which give no indication of any differentiation in properties among them and which does not disclose appellant's specific ester. Murray et al. and Minlon taken together do not teach the compound of appellant's claim or its utility. * * * "

I will agree that after appellant had disclosed his invention, and with this disclosure to guide us, the selection of bits and pieces of information from Murray et al. and from Minlon can be made and then readily combined. Yet, this does not resolve the central issue which must be resolved under section 103, i. e., was it obvious to one of ordinary skill to so combine these references *at the time appellant's invention was made?*

I think the present record discloses that appellant's invention was not obvious when so tested. Appellant asserts that Murray et al. embraces "hundreds of thousands of possible esters." The majority narrows this to "relatively few" compounds. In either event, it is necessary before using the Murray et al. disclosure in such a rejection to make an intelligent selection from among these many compounds. I find nothing in the record except appellant's disclosures which suggests making such a selection. Does this make the selection "obvious"? I think not. I am reinforced in this analysis by the way in which both the board and the majority draw on Minlon in order to arrive at the *combination* of references on which the conclusion of obviousness is predicated. In the absence of appellant's teachings from the prior art, there simply is no basis upon which to predicate what seems to be the most unlikely combination of Murray et al. and Minlon.

Both Murray et al. and Minlon fail to give any indication of either the utility

or the properties of the compound of appellant's claim except as these properties are attributable to them by hindsight. In evaluating the asserted obviousness, the compound and all of its properties must be evaluated. "[C]laims to chemical compounds are drawn to more than structural formulae." In re Ward, 329 F.2d 1021, 1023, 51 CCPA 1132, 1134. "[T]here is no basis in law for ignoring any property in making a comparison of the claimed and prior art compounds." In re Lundsford, 327 F.2d 526, 528, 51 CCPA 1000, 1003. "The problem of 'obviousness' under section 103 in determining the patentability of new and useful chemical compounds * * * is not really a problem in chemistry or pharmacology * * *. It is a problem of *patent law*." In re Papesch, 315 F.2d 381, 386, 50 CCPA 1084, 1091.

The majority opinion, it seems to me, has approached the problem of obviousness in this case as a problem in chemistry or pharmacology in which it has found both the problem stated and its solution in appellant's disclosure rather than in the prior art. Under these circumstances, it seems to me that a conclusion of obviousness is not warranted, for it was appellant who first disclosed the new compound and who first taught the art its novel utility. There simply is no teaching of appellant's invention as a whole to be found in the *combination* of references on which the majority bases its opinion. There is nothing in the record upon which to find that the expected skill of the art could without appellant's disclosure extract such teaching from Murray et al. and Minlon.

In retrospect, almost any invention can be seen to be but a naturally occurring thought leading to an obvious combination of bids of previously acquired knowledge. It is a most difficult task to remove from the prior art the invention for which a patent is sought but this is what we must do in applying section 103 before we attempt to pass judgment as to obviousness. As has been aptly observed recently, "It is not easy for the human mind to put what is now obvious back into the box labelled 'unknown.' "[1] Yet this is precisely what must be done if section 103 is to mean anything. The failure of the majority here to put what appellant taught into the "box labelled unknown" makes its conclusion plausible but wholly without statutory support.

I would, therefore, reverse the appealed rejection.

---

1. Ferguson, "The Origins of the Steam Engine," Scientific American, Vol .210, p. 103 (1964).