**GENERAL MOTORS CORPORATION,**
Appellant,

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION and Kuhlman Corporation, Appellees.**

Appeal No. 82–7.

United States Court of Customs
and Patent Appeals.

Sept. 3, 1982.
Certiorari Denied Jan. 10, 1983.
See 103 S.Ct. 729.

George E. Frost, Frederick M. Ritchie, Detroit, Mich., for appellant.

Michael H. Stein, Jane Katherine Albrecht, Washington, D. C., for appellee ITC.

William L. Anthony, Jr., Richard A. Walker, and John C. Demeter, Birmingham, Mich., for appellee Kuhlman.

Before MARKEY, Chief Judge, BALDWIN, MILLER, and NIES, Judges, and FRIEDMAN, Chief Judge.[1]

NIES, Judge.

This appeal is from the final determinations of the International Trade Commission (Commission) with respect to the validity of certain patents in an investigation conducted under 19 U.S.C. § 1337[2] in which the Commission found unfair methods of competition in the importation of certain spring assemblies used in automatic transmissions for automobiles.[3]

1. The Honorable Daniel M. Friedman, Chief Judge, United States Court of Claims, sitting by designation.

2. 19 U.S.C. § 1337(a) provides:
   (a) *Unfair methods of competition declared unlawful.*
   Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently

and economically operated, in the United States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are declared unlawful, and when found by the President to exist shall be dealt with, in addition to any other provisions of law, as hereinafter provided.

3. Investigation No. 337–TA–88 entitled "Certain Spring Assemblies and Components Thereof, and Methods for Their Manufacture."

The exclusion order based on this determination, which was entered by the Commission on August 10, 1981, and amended August 19, 1981, prevents appellant from importing such products from its regular Canadian supplier unless licensed by Kuhlman Corporation (Kuhlman), the owner of U. S. Letters Patent 3,782,708 ('708 patent), covering the spring assembly, and 3,866,287 ('287 patent), covering the method of its manufacture. Appellant asserts that the patents on which the exclusion order is based are invalid and that the Commission's final determinations are, therefore, erroneous. We affirm.

### Background

Kuhlman is the record owner of the subject patents. The named inventors, Messrs. Dulude and Winbigler, are employees of Kuhlman or its Quality Spring division. On December 1, 1971, Dulude and Winbigler applied for a patent for "Spring Assembly and Methods and Machines for the Manufacture Thereof." As a result of a requirement made by the examiner during the prosecution of the application, a divisional application was filed on February 13, 1973, for "Methods for the Manufacture of Spring Assemblies." The '708 patent issued January 1, 1974, on the original application and contains claims directed solely to a spring assembly apparatus. Claim 1 is representative:

A spring assembly comprising a sheet metal stamping including an annular base portion and a plurality of protuberances formed integrally on said base portion and circumferentially spaced around said annular base portion and projecting in one direction therefrom, and a plurality of compression coil springs individually having a portion of one turn secured by each of said protuberances to said annular base portion, said one turn being unground and of uniform cross-sectional material, all other turns of each of said springs being spaced from said base portion, all portions of said springs other than said one turn lying in their free unconstrainted positions, said springs projecting in substantial parallelism with one another from said base portion in said one direction.

The '287 patent issued February 18, 1975, on the divisional application and contains claims directed solely to the method of making the '708 patent's spring assemblies. The disclosures in the two patents are identical except for the claims. Fig. 2 and Fig. 3, shown below, illustrate the format of the claimed spring assembly and a cross-section of a protuberance which secures no more than one bottom turn of a spring, respectively:

In 1969, General Motors (GM) used helical springs in the clutch assemblies of some of its transmissions. The springs for some clutches were assembled by hand; others were assembled by automatic spring feeders before they were secured in place in the clutch. Assembly of the springs by hand often resulted in the tangling of many of the springs. As illustrated below, the springs were placed over bosses 18 on piston 16. They were then carried on a jiggling conveyor, and because they were not secured, frequently fell out of position before they were finally secured in place in the clutch by stamping 14.

Assembly of the springs required high labor costs to assure that all the springs in each assembly reached the clutch, and a large number of tangled springs were lost as scrap. Several GM employees suggested that the springs be preassembled on the stamping, so that they would not become tangled and would remain in position until they were secured in the clutch assembly.

In late 1970, Mr. Kruse, an engineer at GM's Chevrolet-Parma plant, built a model spring assembly by securing the springs to a base with epoxy. This model (Kruse epoxy model) shows the format of the patented spring assembly.

On February 3, 1971, Mr. Kruse submitted a "methods improvements proposal" to attach springs to a spring retainer. He suggested three possible methods of attaching the springs to the stamping: (1) gluing, (2) brazing, or (3) "making projections on retainer which capture spring." The latter suggestion consisted of forming a protuberance over which the spring would be forced

and held in place by friction. This friction fit concept was rejected because it would require too close a tolerance and more metal than could be sacrificed from the metal stamping.

On February 24, 1971, Mr. Dooley, a buyer from GM's Chevrolet-Parma plant, showed the Kruse epoxy model to coinventor Dulude and discussed three possible ways to make the spring assembly: (1) welding, (2) adhesive bonding, and (3) the above-described friction fit.[4]

It is not clear whether Dooley indicated that these methods of attachment were tried by GM but did not work, or whether he suggested them as ways that could be pursued. We agree with the Commission that it seems unlikely that Dooley told Dulude that the three suggested methods would work, because he was aware that GM had considered them and had not produced a usable spring assembly.

In any event, Dulude decided that he would form open protuberances on which the springs would be placed and would expand the protruded metal by using a punch in order to stake or grip the springs. Dulude discussed this idea with coinventor Winbigler, who immediately went to work on the project.

After about two weeks, a few hand-made prototypes were made. Several different types of staking tools were tried. On the first models, the springs had to be straightened by hand.

In March 1971, Dulude showed a prototype of the spring assembly to Dooley, who was impressed with it. Dooley said that he thought that it would save GM the cost of making cast bosses on the piston. The concept quickly was accepted for use in some GM transmissions.

After many months, Dulude and Winbigler developed a process for mass producing these spring assemblies (the process patented in the '287 patent), and began selling them to GM in 1971.

4. The Kruse epoxy model and the Dooley/Dulude disclosures are collectively referred to

herein as the "Dooley disclosures".

In 1977, P. J. Wallbank Co., Ltd., of Canada (Wallbank) entered the U. S. market selling spring assemblies identical to those being marketed by Kuhlman. On June 23, 1980, Kuhlman filed a complaint with the Commission alleging a violation of 19 U.S.C. § 1337 in that Wallbank's importation and sale of spring assemblies was unauthorized, the spring assemblies infringed claims 1, 2 and 7–11 of the '708 patent, and the spring assemblies were made by a process which, if practiced in the United States, would infringe certain claims of the '287 patent.

On August 8, 1980, the Commission issued a notice of investigation naming as respondents Wallbank, Ford Motor Co. (Ford), and GM. 46 Fed.Reg. 7106 (1980).

Before the administrative law judge (ALJ) respondents took the position that the claims of both patents asserted by Kuhlman would have been óbvious in view of the prior art and, therefore, were invalid under 35 U.S.C. § 103.[5] Invalidity was also asserted on the basis that Dulude and Winbigler failed to disclose their best mode of carrying out the invention in contravention of the first paragraph of 35 U.S.C. § 112.[6]

Upon completion of the investigation, the ALJ recommended the Commission find no violation based on the claims of the '708 patent which she considered invalid over the prior art. The ALJ did, however, recommend that a violation be found on the basis that certain claims of the '287 patent, which she considered valid, would be infringed by Wallbank's process of manufac-

turing spring assemblies if practiced in the United States.

The ALJ rejected respondent's position regarding the patentee's failure to disclose the best mode of practicing the invention as required by § 112.

The Commission rejected the ALJ's finding that the '708 patent was invalid over the prior art but otherwise adopted her recommendations (except in particulars not relevant here). The Commission thereupon entered the subject exclusion order, which became final for purposes of appeal on October 10, 1981, and which provides that assemblies either infringing claims 1, 2, or 7–11 of the '708 patent or made by processes claimed in the '287 patent are excluded from importation into the United States except under license from Kuhlman.

Only GM appeals, renewing its challenge to the validity of the '708 patent under § 103 and to both patents under § 112, but not otherwise attacking the order entered by the Commission.

## OPINION

### Standard for Review

As pointed out in the Commission's brief, this is the first appeal to raise a question of the standard for review of Commission determinations concerning validity of a U. S. patent since the amendment of 19 U.S.C. § 1337(c) by the Customs Courts Act of 1980, P.L. 96–417, § 604, 94 Stat. 1744.[7]

---

**5.** 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

**6.** 35 U.S.C. § 112, first paragraph, provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as

to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, *and shall set forth the best mode contemplated by the inventor of carrying out his invention.* [Emphasis added.]

**7.** By this amendment 19 U.S.C. § 1337(c) was revised to read:

Any person adversely affected by a final determination of the Commission under subsection (d), (e), or (f) [of this section] may appeal such determination to the United States Court of Customs and Patent Appeals for review in accordance with chapter 7 of Title 5.

The relevant portion of Title 5, 5 U.S.C. § 706(2)(E) provides:

The Commission argues that, in view of the amendment, "the appropriate standard of review for the issues presented in this appeal is substantial evidence."

In *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966), the Supreme Court provided the following exposition of the "substantial evidence" test:

> We have defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229 [59 S.Ct. 206, 216, 83 L.Ed. 126, 1938]. "[I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Labor Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 [59 S.Ct. 501, 505, 83 L.Ed. 660, 1939]. This is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. [Footnote omitted.]

While we agree with the Commission's position that factual determinations must be reviewed under this standard, we do not agree that all issues presented in this appeal are merely questions of fact.

In *Stevenson v. USITC*, 67 CCPA 109, 112, 612 F.2d 546, 549, 204 USPQ 276, 279 (1979), this court stated:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
>     \*    \*    \*    \*    \*    \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>     \*    \*    \*    \*    \*    \*
>
>   (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 U.S.C. §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute....

Obviousness is a legal conclusion based on factual evidence, *Graham v. John Deere Co.*, [383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ], . . . and not a factual determination.

The factual determinations from which to draw the conclusion of obviousness were set out by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966):

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art are resolved.

These parameters provide guidelines but, nevertheless, leave difficult questions to be resolved by appellate courts on the more precise boundaries, as indicated by several recent decisions involving appeals from jury trials in patent cases where the same standard must be applied.[8] However, the task here is not so difficult. We are in entire agreement with the Commission's factual determinations and with its conclusions that the subject patents have not been proved invalid.

### The Prior Art

The prior art references on which GM relies to show obviousness of the spring assembly in the '708 patent are U. S. Patent No. 3,122,829 to Schaad and certain Delco-Moraine Brake Expander Springs (D–M Spring),[9] both of which had been considered by the examiner, and the Dooley disclosures, which were not.[10]

8. *See*, e.g., *Dual Mfg. & Eng. Inc. v. Burris Ind. Inc.*, 619 F.2d 660, 205 USPQ 1157 (CA 7) (In Banc), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208 (1980).

9. The D–M spring is a collective reference to several types of springs used in the Delco-Moraine Brake assembly. However, they are virtually identical and GM does not assert them separately.

10. While GM injects overtones of fraud in the patentees' failure to bring the Dooley disclosures to the attention of the examiner, this attack is not further developed.

The Schaad patent discloses a plurality of conical springs for use in automobile seat cushions. The bottom 1½ turns (dead turns) of each spring are securely staked to a metal pan by sliding the dead turns over a protuberance stamped in the pan and bending or crimping the entire rim portion of the protuberance over the dead turns (360° stake), thus:

[The dead turns comprise cross-sections B, C, and D.]

The springs are held in substantial parallelism by a cover plate (marked as 10) with preformed channels into which the tops of the springs are fitted. The dead turns are wasted turns of the spring because they serve only to allow attachment of the spring to the pan and, being restrained, perform no spring functions (e.g., bending, twisting, etc.). In contrast, the subject invention reduces the number of useless dead turns while maintaining a secure attachment and does not require a plate comparable to cover plate 10 to achieve parallelism.

The D–M spring, a single spring for use in a brake assembly, has only one dead turn held to a sheet metal seat by means of staking. Unlike the Schaad patent, the attachment is not a 360° stake but is accomplished by bending the metal over at four discrete points around the periphery of the protuberance, thus:

A secure attachment is not required or achieved in the D–M spring. The sheet metal seat must only be temporarily held to the spring until the entire spring/seat apparatus is placed in a brake assembly. The brake assembly captures the spring/seat apparatus, thereby holding the seat against the spring at all times.

Secure attachment was necessary in the GM transmission, and the Dulude solution to the problem not only achieved this objective but also resulted in cost savings. As stated by the Commission:

> Under the GM specifications, the springs had to be so securely attached that they could survive a 90-degree bend in any direction when a load was applied to the unattached end of the coil. The springs had to be relatively straight, i.e., perpendicular to the base. If the springs were securely attached to the base, the expensive cast bosses on the transmission which formerly had held the springs in the clutch could be eliminated, thereby effecting a cost saving. Thus, ideally, the attachment not only had to be secure enough to keep the spring in place until assembled, but also had to last the life of the transmission. [Footnote omitted.]

Because the Dooley disclosures did not solve GM's various objectives, the Commission considered them to be non-functional concepts and no more than the "format" of

the desired spring assembly. Accordingly, in the Commission's view, the Dooley disclosures were not "prior art." The Commission did, however, consider them to be "indicative of the level of skill in the art."

GM argues that if the Dooley disclosures had been treated as "prior art" within the meaning of the statute,[11] the Commission could not have ignored them in reaching its conclusion on the issue of obviousness, nor supported its decision by reliance on the presumption of the patent's validity. Both contentions must fail.

■ Contrary to GM's interpretation of the effect of the statutory presumption of validity, 35 U.S.C. § 282, it is well settled in this court that "a patent shall be presumed valid and the burden of persuasion is and always will remain on the party asserting invalidity ...." *Stevenson v. USITC*, supra 67 CCPA at 115, 612 F.2d at 551, 204 USPQ at 281, citing *Solder Removal Co. v. USITC*, supra.

Moreover, not only did the Commission in fact consider the substance of these disclosures in reaching its conclusions, but also found them not to be as pertinent as the Schaad patent, a view we share. The Schaad patent teaches a number of the essential elements of the claimed invention, whereas the Dooley disclosures conveyed no more than "the way the thing should look," which the Commission deemed, in any event, would have been obvious to those skilled in the art.

Denominating the Dooley disclosures as "prior art" would not change these conclusions.

### Obviousness

The ALJ concluded that Dulude and Winbigler's invention resided in securely attaching a plurality of springs by staking no more than one dead turn. Because nothing in the prior art suggested this could be done, the ALJ found the *invention* "not obvious" but found the *claims* to be overly broad, because the claims were not limited to staking as the means for securing the springs to the plate. In the ALJ's view:

> ... the claims are broader than the invention. A claim can distinctly claim an invention broader than the specific embodiment of the invention disclosed in the specification, but it cannot be broader than what the applicants invented. In the instant case, the claims are so broad that any minor differences between the claims and the prior art would have been obvious to a hypothetical person with ordinary skill in the pertinent art at the time the invention was made, because the claims merely combine well known elements of the prior art.
>
> \*   \*   \*   \*   \*   \*
>
> ... In the instant case, no synergistic effect is claimed. The combination of known elements covered by the broad claims of the '708 patent would have been obvious to one with ordinary skill in the art.

The Commission rejected this "overbreadth" analysis concluding that the claims are expressly limited to only one turn and to being secured by the claimed protuberances. This pair of limitations is not taught or suggested by the prior art. Therefore, we agree with the Commission that "what was necessary to construct a *functional* version of the needed format [spring assembly] would not have been obvious to one of ordinary skill" (emphasis in original).

Thus, because the Commission looked for specific language in the claims setting forth structural limitations, the Commission can not be said to have endorsed claims to vague "end result functional features" which would be disapproved under GM's interpretation of *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850).

Incongruously, GM endorses the ALJ's position that since no synergistic effect (i.e., end result) is claimed, the subject spring assembly must have been obvious. Under

---

**11.** In contrast to the question of what the prior art teaches (i.e., its scope and content), what constitutes prior art within the meaning of the statute is a question of law. *In re Schoenewaldt*, 52 CCPA 1258, 343 F.2d 1000, 145 USPQ 289 (1965).

this standard, which we reject, one would focus solely on the product created rather than on the obviousness or nonobviousness of its creation, as required under § 103.

▮ In view of the foregoing, we agree with the Commission that the claims are not overbroad and that the failure of the prior art to reflect an appreciation that a secure attachment can be achieved with no more than one turn leads to the conclusion that the claimed spring assembly of the '708 patent would not have been obvious.[12]

### Best Mode

GM asserts that both the '708 and '287 patents are invalid under § 112 because they do not disclose a "spring leaning" problem and its solution, said to be part of the inventors' best mode of practicing the invention which, as claimed, requires springs "projecting in substantial parallelism."

It is correct that Dulude and Winbigler encountered a problem with springs leaning in various directions after being secured by their staking method. However, after the shape of the assembly punch, the shape of the extrusion, and other disclosed variables were optimized to result in a secure attachment of a portion of only one turn, Winbigler determined that the lean of the springs was "in a predictable direction relative to the cutoff of the end turn, or relative to their angular orientation at the time they were attached to the stamping." The evidence shows that once the lean was found to be predictable, it was readily corrected with a minor adjustment to the coiler machine.

GM contends that the leaning *problem* was not obvious to one of skill in the art and failure to at least disclose the problem known to exist, no matter how easily it might be solved, constitutes a failure to disclose one's best mode of practicing the invention. However, the evidence intro-

duced by GM does not "tend to show that the *quality* of [the disclosures] is so poor as to effectively result in [accidental or intentional] concealment [of the best mode]." *In re Sherwood*, 613 F.2d 809, 816, 204 USPQ 537, 544 (CCPA 1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981). There is no evidence that the spring leaning problem was intentionally left out of the patent disclosures and none to counter Winbigler's testimony that, if such lean occurs, one of ordinary skill in the art would easily recognize that it is predictable and would know how to correct it. Moreover, the Commission determined that lean is not a necessary consequence of practicing the invention, relying on the ALJ's finding that Wallbank's infringing process did not encounter any spring leaning problem. GM has not shown any error in this finding.

Finally, we do not agree with GM's argument that the Commission applied one standard of level of skill in the art when considering § 103, and another under § 112. It does not follow that if one of skill in the art could correct any spring leaning problem, the invention as a whole must have been obvious.

### Conclusion

The final determinations of the Commission are *affirmed*.

AFFIRMED.

---

**12.** We find it unnecessary to consider appellant's challenges to the statements in appellee's brief with respect to the probativeness of appellee's evidence of commercial success, prior failures by others and the like. GM does not challenge the weight which the Commission gave to the evidence. Indeed, GM states that the Commission "wisely gave" the events "the matter-of-fact treatment they deserve."